# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-2621

_____

|  |  |  |
|---|---|---|
| Timothy C. Owen; Gloria J. Owen, | * | |
| | * | |
| Appellants, | * | Appeal from the United States |
| | * | District Court for the |
| v. | * | Western District of Missouri. |
| | * | |
| General Motors Corporation, | * | [PUBLISHED] |
| | * | |
| Appellee. | * | |

_____

Submitted: March 14, 2008
Filed: July 17, 2008

_____

Before WOLLMAN, HANSEN, and MELLOY, Circuit Judges.

_____

HANSEN, Circuit Judge.

Timothy and Gloria Owen brought this putative class action suit against General Motors Corporation (GM) after their windshield wipers failed, asserting claims of breach of warranty, breach of contract, unjust enrichment, fraudulent concealment, and violation of the Missouri Merchandising Practices Act (MMPA), Mo. Rev. Stat. § 407.025 (2000). See 28 U.S.C. § 1332(d)(2) (prescribing the

elements of class action jurisdiction); see also Fed. R. Civ. P. 23. The district court[1] granted in part GM's motions to dismiss on statute of limitations grounds and for failure to state a claim, and the district court granted summary judgment to GM on the remaining claim due to the Owens' failure to establish causation under the MMPA. The Owens appeal, and we affirm.

I.

The Owens purchased a 1999 Chevrolet Tahoe on May 8, 1998, and approximately 6½ years later on October 9, 2004, the windshield wipers on the Owens' Tahoe failed while Mr. Owens was driving through a construction zone in heavy rain, impairing his visibility. The complete vehicle had been covered by an express warranty extending 3 years or 36,000 miles. The Owens paid a GM dealer $91.87 to replace the wipers. The dealer kept their old wiper control module, and GM did not reimburse this out-of-warranty cost. The dealer informed the Owens that the wiper control module had been subject to two prior recalls due to wiper failures but that the recalls applied only to earlier model vehicles, not to the Owens' 1999 Tahoe.

The complaint alleges that at the time of sale to the Owens, GM knew that in earlier models, the same or similar windshield wiper motor assembly was prone to fail after the warranty had expired. The complaint also alleges that GM did not disclose these failures, or this alleged defect, to the Owens when they purchased their 1999 Tahoe. The first recall in 1998, was issued in response to increasing customer complaints of wiper failures and a resulting investigation by the National Highway Traffic Safety Administration's Office of Defects Investigation (NHTSA). GM recalled the wiper control module on certain 1994 through 1996 model trucks and sport utility vehicles (SUVs), including certain Tahoes, because specific engine/model

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

combinations were prone to wiper motor failure. Specifically, the location of the wiper motor on the recalled vehicles subjected the motor to high temperatures within the engine compartment, which caused the single-sided solder joints near the wiring harness connector to crack. GM reported to the NHTSA that the increase in wiper motor failures on recalled models began occurring after August 1994, when GM had implemented a change in its wiper control module supplier and had made changes in the control module design specifications and the manufacturing process. GM was aware of the problem by June 1997. The 1998 recall included over 1.5 million vehicles.

GM issued a second recall of 1.7 million vehicles in April 2003, in response to continued complaints and an expanded investigation by the NHTSA, again citing potential windshield wiper failure "due to cracked solder joints on the controller circuit board." (Appellants' App. at 300-02.)[2] This expanded recall included 1994 to 1996 model Tahoes. By 2002, GM warranty claims related to wipers on the entire recalled group of vehicles had totaled 225,000, and there were at least 11 reported auto accidents related to windshield wiper problems by December 1999. Although GM initially asserted that the alleged defect was not related to safety due to the low incidents of accidents or injuries, it later admitted that safety consequences can ensue from the failure of a windshield wiper system. The NHTSA's report indicated that "[t]he likelihood of failure increases with the level of heat to which the windshield wiper motor assembly is exposed," which, in turn, is related to its position within the engine compartment. (Id. at 304.) GM reported that it had made several modifications to the wiper module in 1998, and the NHTSA report stated that after the changes, "the incidence of the problem of failing windshield wipers was reduced." (Id. at 286.) GM did not recall 5.8 million vehicles that have the same or similar windshield wiper control module as the vehicles that were included in the recalls.

[2]In reviewing a motion to dismiss, we may consider documents attached to the complaint. Great Plains Trust Co. v. Union Pac. R.R., 492 F.3d 986, 990 (8th Cir. 2007).

Also in 2003, GM implemented a Special Policy Adjustment Program ("Special Policy") to cover other 1994 to 1997 vehicles investigated by NHTSA . The Special Policy offered owners of those models a limited-term extended warranty and reimbursement to those who had paid to replace their windshield wiper motors. The Special Policy did not cover any vehicle with a model year after 1997 and neither did the earlier recalls.

The Owens filed this putative class action suit on April 3, 2006, on behalf of themselves and all other United States citizens or residents, excluding commercial entities, who owned or leased a 1998 or 1999 GM vehicle with the same allegedly defective wiper module and who were not compensated for repairs made to correct it. The original complaint alleged six counts: Count I (unjust enrichment), Count II (injunctive relief), Count III (breach of implied warranty), Count IV (breach of express warranty), Count V (violation of the MMPA, Mo. Rev. Stat. § 407.025), and Count VI (breach of implied warranty under the Magnuson-Moss Warranty Act (MMWA), 15 U.S.C. §§ 2301-2312 (2000)).

GM moved to dismiss the complaint, partly relying on the statute of limitations. While the motion to dismiss was pending, the Owens requested permission to file a first amended complaint adding approximately 40 new paragraphs of factual assertions and two new counts–Count VII (breach of contract based on the Special Policy) and Count VIII (fraudulent concealment). The Owens represented to the court that because the proposed amendment would not materially alter the original counts, the amended complaint would not require rebriefing of the issues related to the pending motion to dismiss. The district court then granted the Owens leave to file the First Amended Class Action Complaint and granted in part GM's first motion to dismiss, concluding that the breach of warranty claims were barred by the statute of

limitations.[3]  The Owens thereafter filed a second motion for leave to amend the complaint, which the district court denied, and GM filed a second motion to dismiss, which the district court granted, dismissing the newly added counts of breach of contract and fraudulent concealment for failure to state a claim.[4]

GM then filed a motion for summary judgment on the only remaining claim–that GM violated the MMPA (Count V) by failing to disclose or remedy an alleged defect in the wiper system.  The summary judgment record, viewed in the light most favorable to the Owens, includes the report of GM's internal investigatory team, headed by Dr. Michael Pecht, and Dr. Pecht's statement as the Owens' designated expert.  GM commissioned its team in March 1998 in an attempt to determine the source of the wiper problems.

Among the malfunctioning wipers that had been replaced while under warranty, the team identified 15 categories of possible reasons for the wiper failure, including solder joint failures, design changes, and manufacturing variables.  In wiper modules made after 1994, some circuit boards had come into contact with the aluminum casting of their housing and there was a wide variation in the quality of solder joints among the units that failed.  The team determined that single-sided solder joints produced in Juarez, Mexico, were particularly prone to fatigue cracking but no defect at all was identified in 23% of the circuit boards returned due to reported failures.  The team recommended replacing the single-sided windshield wiper circuit board with a double-sided circuit board that would be less prone to solder joint failure.  GM continued manufacturing and installing the single-sided windshield wiper circuit boards until the double-sided units could be produced.  GM also continued installing the single-sided

[3]The district court also dismissed Count II (seeking injunctive relief), but that dismissal is not challenged on appeal.

[4]The district court also dismissed Count I (claiming unjust enrichment), which the Owens do not challenge on appeal.

units in new vehicles until it exhausted its supply. GM did not recall 1998 or 1999 vehicles with the same single-sided circuit board, concluding that any malfunction was not likely to occur within the warranty period.

The Owens designated Dr. Pecht as their expert, and his report states the opinion that "the single sided / CEM circuit card assembly, common to the vehicles being manufactured by GM prior to the implementation of the double sided [circuit assembly] . . . was not robust enough and not appropriate for a vehicle which must survive more than a 3 year, 36,000 mile[] warranty period." (Appellants' Add. at 53.) Because the failure results from solder fatigue, Dr. Pecht recommended that GM replace the single-sided assembly with a stronger double-sided circuit assembly. He concluded, "otherwise, there is an increasing likelihood that it will fail outside the warranty period." (Id.) They presented no evidence diagnosing the reason that their wiper motor failed.

The district court granted summary judgment to GM on the MMPA claim, concluding that there was no evidence indicating that the Owens' loss resulted from a defect that GM failed to inform them of. The district court also denied as moot the Owens' pending motion for class certification. The Owens appeal.

## II.
### A. Motions to Dismiss

"This court reviews *de novo* the grant of a motion to dismiss, taking all facts alleged in the complaint as true." Students for Sensible Drug Policy Found. v. Spellings, 523 F.3d 896, 899 (8th Cir. 2008) (internal marks omitted). Additionally, "we may consider documents attached to the complaint and matters of public and administrative record referenced in the complaint." Great Plains Trust Co., 492 F.3d at 990.

The Owens argue that the district court erred in dismissing their breach of warranty claims on statute of limitations grounds. Missouri's Uniform Commercial Code (the Missouri UCC) prescribes a four-year statute of limitations applicable to breach of warranty claims on the sale of goods, which begins to run when tender of delivery is made, unless the goods are sold with a warranty for future performance. See Mo. Rev. Stat. § 400.2-725(1), (2) (2000); Wienberg v. Independence Lincoln-Mercury, Inc., 948 S.W.2d 685, 689 (Mo. Ct. App. 1997). If goods are sold with a warranty for future performance, "the cause accrues on and the statute of limitations runs from the date on which the defect was or should have been discovered." Wienberg, 948 S.W.2d at 689 (citing Mo. Rev. Stat. § 400.2-725(2)).

The Owens assert that they purchased their vehicle in May 1998 with a warranty for future performance and that therefore the statute of limitations on their breach of warranty claims did not begin to run until the date they discovered the defect–that is, when their wipers failed in October 2004–and that they timely filed suit within three years of this discovery. We respectfully disagree. Although the Owens did not discover the alleged defect until October 2004, the three-year express warranty for future performance lasted only through May 2001. The life of an express warranty cannot be extended beyond its terms by the discovery exception of the statute of limitations. The cause of action for breach of an express warranty begins to accrue upon discovery only if the defect is, or should have been, discovered within the warranty period; at the latest, the cause of action begins to accrue on the date when the express warranty expires. See 1 The Law of Prod. Warranties § 11:4, WL PRODWARR § 11:4 (noting that when a period of time is stated in the warranty, "the four-year clock begins to tick when the breach is discovered or should have been discovered, or when the explicit time period expires, whichever occurs first"); see also Ouellette Mach. Sys., Inc. v. Clinton Lindberg Cadillac, Co., 60 S.W.3d 618, 622 (Mo. Ct. App. 2001) (concluding "that for any defect discovered in the four-year warranty period, the car buyer has four years to bring a cause of action under the statute of limitations contained in Section 400.2-725"). Because the alleged defect

was not discovered within the life of the three-year express warranty, the statute of limitations for the breach of warranty claims cannot run from the date the Owens discovered the defect. The district court correctly concluded that the warranty claims here were barred by the four-year limitations period. The three-year express warranty expired in May 2001, the four-year limitations period expired in May 2005, and the Owens did not file suit until April 2006.

To the extent the Owens assert that GM's Special Policy provision amounted to a separate warranty for future performance extending to defects discovered beyond the three-year express warranty, we find this argument to be without merit. Missouri courts have held that "[t]o constitute a warranty for future performance, the terms of the warranty must unambiguously indicate that the manufacturer is warranting the future performance of the goods for a specified period of time." Wienberg, 948 S.W.2d at 689. The Special Policy provision is nothing more than notice that GM might at some unspecified time voluntarily offer to pay for repairs that are no longer covered by the three-year express warranty; it is not a separate warranty for future performance.

Alternatively, the Owens assert that the limitations period should be tolled by GM's fraudulent concealment of the nature of the alleged defect.[5] "To constitute

---

[5]In Missouri, it is well-settled that statutes of limitations are favored and can be avoided only by strictly complying with specific legislative exceptions, which courts cannot extend. See Neal v. Laclede Gas Co., 517 S.W.2d 716, 719 (Mo. Ct. App. 1974). The general chapter on statutes of limitations sets forth a specific legislative exception that permits tolling for a breach of contract claim where a defendant's improper act conceals the cause of action. See Mo. Rev. Stat. § 516.280 (2000); Greeson v. Ace Pipe Cleaning, Inc., 830 S.W.2d 444, 447 (Mo. Ct. App. 1992); see also Kauchick v. Williams, 435 S.W.2d 342, 345 (Mo. 1968) (en banc) (noting that this provision is "usually associated with fraudulent concealment"). This general tolling provision ordinarily would not extend to a special statute of limitations, such as applies here through the Missouri UCC. See Mo. Rev. Stat. § 516.300; see also

-8-

concealment of a cause of action within the general rule tolling the statute of limitations on that ground the concealment must be fraudulent or intentional and, . . . there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action." Hasenyager v. Bd. of Police Com'rs of Kansas City, 606 S.W.2d 468, 471 (Mo. Ct. App. 1980) (internal marks omitted). To avoid the running of the statute of limitations, the fraudulent concealment "must be something more than mere silence on defendant's part . . .; usually the employment of some means or device to prevent discovery should be shown." Gilliam v. Gohn, 303 S.W.2d 101, 107 (Mo. 1957). Silence becomes misrepresentation only when there is a duty to speak, such as "when one of the parties has superior knowledge or information not within the fair and reasonable reach of the other party." Bohac v. Walsh, 223 S.W.3d 858, 864 (Mo. Ct. App. 2007).

The pleadings assert that GM's silence constituted concealment because GM had "superior knowledge" of the allegedly dangerous and defective nature of the wiper module by 1997 but concealed this from the Owens so that they did not discover their cause of action until their wipers failed in October 2004, over three years after the expiration of the warranty. The only specific "superior knowledge" alleged was that the single-sided solder joints of the wiper control module were used on multiple platforms in 1993 through 1998 model vehicles and that the module could suffer random solder joint failures after 12 months due to fatigue. This does not demonstrate superior knowledge of a defect in the Owens' 1999 Tahoe wiper module that should

---

Braun v. Petty, 129 S.W.3d 449, 452 n.3 (Mo. Ct. App. 2004) (stating Missouri courts have "uniformly held that where a statute of limitations is a special one, not included in the general chapter of limitations, the running thereof cannot be tolled because of fraud, concealment, or any other reason not provided in the statute itself") (internal marks omitted). However, the legislature explicitly stated in the Missouri UCC that the special four-year limitation applicable to breach of warranty claims "does not alter the law on tolling of the statute of limitations," Mo. Rev. Stat. § 400.2-725(4). Thus, the plain language of the statute preserves the possibility of equitable tolling on account of fraudulent concealment as set forth in the general limitations chapter.

have been disclosed. Additionally, the pleadings indicate that the Owens' wipers worked without incident for 6½ years and 98,000 miles, the prior recalls were public in nature, and GM cooperated with the NHTSA's investigation, which did not encompass the 1999 Tahoe. GM had implemented several design and manufacturing process changes by 1998 that reduced the rate of failures such that the NHTSA did not require further recalls. GM's knowledge of prior solder joint failure due to fatigue and its failure to notify the Owens that the wiper control module could fail due to fatigue after the expiration of the three-year warranty are not so remarkable as to amount to fraudulent concealment of the Owens' breach of warranty claim that would justify equitable tolling of the statute of limitations.

For the same reason, the district court properly dismissed the substantive count of fraudulent concealment. A party must plead the circumstances of each element of fraud with particularity. Bohac, 223 S.W.3d at 863. As already noted, the failure to disclose information in the face of an obligation to do so or superior knowledge can serve as a substitute for the false representation element required to plead fraud. See id. at 864; Brown v. Mickelson, 220 S.W.3d 442, 451-52 (Mo. Ct. App. 2007). The crux of a fraudulent concealment claim is showing that the defendant "affirmatively intend[ed] to conceal from plaintiff the fact that the plaintiff ha[d] a claim against the defendant." Roth v. Equitable Life Assur. Sur. of U.S., 210 S.W.3d 253, 259 (Mo. Ct. App. 2006) (internal marks omitted). We have already concluded that the knowledge allegedly concealed (that the wiper motor could fail due to fatigue after the warranty expired) is not the type of superior knowledge that, if not disclosed, amounts to concealment of a breach of warranty claim. We agree with the district court that the unremarkable knowledge that a windshield wiper motor guaranteed for three years might be prone to failure due to fatigue sometime after the warranty expires is too broad an assertion to establish the type of superior knowledge that can substitute for the false representation element of fraudulent concealment.

-10-

The Owens also challenge the district court's dismissal of their breach of contract claim. They argue that the complaint states a common law breach of contract claim based on GM's allegedly unfair implementation of the Special Policy, which provides that GM "might in the future, without regard to the express warranty, implement a Special Policy Adjustment Program . . . to fund repairs not covered by the warranty." (Appellants' App. at 263.) They assert that fairness and good faith obligated GM to include their 1999 Tahoe in the Special Policy program that offered to repair identical wiper control modules on earlier model vehicles.

Covenants of good faith and fair dealing are implied in every contract in Missouri. See Magruder Quarry & Co. v. Briscoe, 83 S.W.3d 647, 651 (Mo. Ct. App. 2002). This duty prevents a party from exercising a judgment conferred by the express contract "in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." Martin v. Prier Brass Mfg. Co., 710 S.W.2d 466, 473 (Mo. Ct. App. 1986); see also Countrywide Servs. Corp. v. SIA Ins. Co., 235 F.3d 390, 393 (8th Cir. 2000) (construing Missouri contract law). Because GM had no contractual obligation to include the 1999 Tahoe in the Special Policy program, its failure to do so cannot be characterized as evading the spirit of the transaction or denying the Owens the expected benefit of their contract. The district court properly dismissed this breach of contract claim.

The Owens assert that the district court abused its discretion in denying their second motion for leave to amend the complaint, but they proposed no actual changes to the complaint. Rather, they were in effect seeking reconsideration of the district court's dismissal ruling in light of the new facts alleged in the first amended complaint, contrary to counsel's prior representations to the court that the first amended complaint would not require rebriefing of the pending motion to dismiss. The district court refused to permit this and also noted that, in any event, the additional factual averments had been incorporated by virtue of the order granting the first motion to amend. Furthermore, the second proposed "amendment" would have

been futile because the district court concluded that it would not have altered the outcome of the previous dismissal ruling. In light of these adequate justifications, we find no abuse of discretion in the district court's denial of the Owens' second motion for leave to amend the complaint. See Popoalii v. Corr. Med. Servs., 512 F.3d 488, 497 (8th Cir. 2008) (stating that futility justifies denial of a motion to amend and that it is inappropriate to grant leave to amend a complaint where the plaintiff has not submitted a proposed amendment).

## B.
## Summary Judgment

The district court granted summary judgment to GM on the remaining claim–the state law MMPA claim.[6] We review the district court's grant of summary judgment *de novo*, viewing the evidence in the light most favorable to the nonmoving party. See Brannon v. Luco Mop Co., 521 F.3d 843, 848 (8th Cir. 2008). We will affirm the grant of summary judgment if the record demonstrates that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

"The MMPA was enacted to preserve fundamental honesty, fair play, and right dealings in public transactions." Scott v. Blue Springs Ford Sales, Inc., 215 S.W.3d 145, 160 (Mo. Ct. App. 2006). It provides:

> Any person who purchases or leases merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, *as a result of* the use or employment by another person of a method, act or practice declared

---

[6]The MMPA claim is subject to a five-year statute of limitations and was timely asserted. See Mo. Rev. Stat. § 516.120 (2000); Ullrich v. CADCO, Inc., 244 S.W.3d 772, 778 n.3 (Mo. Ct. App. 2008).

-12-

unlawful by section 407.020, may bring a private civil action in either the circuit court of the county in which the seller or lessor resides or in which the transaction complained of took place, to recover actual damages.

Mo. Rev. Stat. § 407.025.1 (emphasis added). Thus, to successfully present an MMPA claim, the Owens must demonstrate that they purchased personal merchandise and that they suffered an ascertainable loss as a result of GM's use of one of the methods or practices declared unlawful by Section 407.020. Those unlawful acts include "any deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce." Mo. Rev. Stat. § 407.020.1 (2000). The MMPA does not specifically define deceptive or unfair practices, but it "simply declares unfair or deceptive practices unlawful" in order to "give broad scope to the meaning of the statute and to prevent evasion because of overly meticulous definitions." State ex rel. Webster v. Areaco Inv. Co., 756 S.W.2d 633, 635 (Mo. Ct. App. 1988). The statute provides that a deceptive practice violates the MMPA regardless of whether the act was "committed before, during or after the sale, advertisement or solicitation," Mo. Rev. Stat. § 407.020.1, and it is not necessary to prove the elements of common law fraud in order to establish an unlawful practice, State ex rel. Webster, 756 S.W.2d at 635.

The Owens assert that they purchased the 1999 Tahoe for personal use and that they suffered an ascertainable loss (the unreimbursed cost of repair) as a result of GM's unfair practice of concealing a defect in the wiper motor assembly. The district court assumed for purposes of summary judgment that GM's failure to disclose the wiper malfunction problems in similar vehicles was a material omission in connection with the sale of an automobile for personal use. The district court concluded, however, that the Owens failed to submit evidence from which a jury could conclude that they suffered an ascertainable loss *as a result of* that omission because they could not demonstrate that the wiper motor in their 1999 Tahoe was actually defective.

The Owens assert that the district court erred in applying the proximate cause standard of tort law to their MMPA claim, but there is no denying that causation is a necessary element of an MMPA claim. Although the MMPA does not sound in tort and does not require a showing of a product defect as a matter of course, the plain language of the MMPA demands a causal connection between the ascertainable loss and the unfair or deceptive merchandising practice. See Mo. Rev. Stat. § 407.025.1. Where, as here, the alleged unfair practice is the failure to disclose a product defect, there must be a showing that the Owens' vehicle in fact suffered that defect, or evidence from which the defect reasonably could be inferred, in order to demonstrate an ascertainable loss *as a result of* GM's failure to disclose the defect. As the district court noted, "in the instant case, evidence of the precise nature of the defect is paramount because only the defect which GM failed to disclose can give rise to an MMPA claim." (Appellants' Add. at 38.)

We agree with the district court that under the facts of this case, there could be "any number of plausible causes for the failure" of the Owens' wipers. (Id. at 35.) There was no direct evidence of a defect in their 1999 Tahoe wiper assembly. The district court properly considered not only the lack of direct evidence of a defect but also the insufficiency of the circumstantial evidence of causation in this case. There is evidence that the same single-sided circuit board assembly failed in other vehicles outside the warranty period due to weak solder joints, but there is also evidence from Dr. Pecht, the Owens' own expert, that 23 percent of the wipers that failed did so for no ascertainable cause and that many vehicles with the same wiper assembly did not fail at all. GM's investigatory team identified 15 possible causes for the failures, and although Dr. Pecht stated that the single-sided circuit board suffered from an "increasing likelihood that it will fail outside the warranty period," he did not conclude that the Owens' circuit board failed because it was defective. Many variables, such as the manufacturing process, design specifications, location within the engine, and various engine and model combinations affected the rate of failure, and the Owens' wiper motor functioned normally for 6½ years and 98,000 miles. The

-14-

district court was correct in concluding that the record does not present evidence from which a jury could conclude, without engaging in speculation, that the Owens' damages resulted from a defect of which GM was aware and failed to warn, or even that circumstantially, the single-sided solder defect was the more reasonable cause of their loss.  See Willard v. Bic Corp., 788 F. Supp. 1059, 1069-70 (W.D. Mo. 1991) (concluding in tort that proximate cause was lacking because other equally plausible causes existed aside from a product defect and also granting summary judgment on the MMPA claim because the record did not indicate that a product defect was the more reasonable cause of the loss).

The Owens argue that they should be permitted to demonstrate the required causation through the theory of *res ipsa loquitur*, which permits the submission of a question involving a product defect on the basis of inference without proof of a specific defect.  See Hickerson v. Pride Mobility Prods. Corp., 470 F.3d 1252, 1258 (8th Cir. 2006) (discussing the *res ipsa loquitur* doctrine under Missouri law).  This inference may be drawn where there is evidence tending to eliminate other possible causes, demonstrating that the product was in the same basic condition at the time of the failure as when it left the defendant's hands, and indicating that this type of failure would not normally occur absent a product defect.  Id.  The undisputed facts do not permit application of the doctrine of *res ipsa loquitur* in this case due to the character and circumstances of the Owens' wiper failure.  Other possible causes of failure were identified and not ruled out, the vehicle was not in the same basic condition as when it left the dealer 6½ years and 98,000 miles earlier, and a fatigue-related failure is not the type of failure that would not normally occur absent a defect.  See Nance v. Morris Motors, Inc., 863 S.W.2d 694, 696, 698 (Mo. Ct. App. 1993) (refusing to apply *res ipsa loquitur* in a vehicle malfunction case where a three-year-old vehicle  had been driven between 70,000 and 80,000 miles before the defendant worked on it, and the vehicle was driven another 4,000 miles after the defendant worked on it before the incident occurred).

The Owens cite <u>Rauscher v. Gen. Motors Corp.</u>, 905 S.W.2d 158, 160-61 (Mo. Ct. App. 1995), for the proposition that they need not point to a specific defect or identify the precise nature of the defect in order to create a jury question, but <u>Rauscher</u> is factually distinguishable. In that strict-liability case, the vehicle had begun stalling within two months of its purchase. After numerous service visits, the problem persisted and could not be identified. Eventually, the vehicle stalled in traffic and caused an accident. <u>Id.</u> The court held that a reasonable jury could conclude on this evidence, without expert testimony about a specific defect, that the vehicle was in a defective and unreasonably dangerous condition. <u>Id.</u> at 160. By contrast, the wiper motor in the Owens' 1999 Tahoe had worked without incident for 6½ years and 98,000 miles before failing. On this record, a jury would have to rely on pure speculation to conclude, without the aid of expert testimony, that the Owens' wiper motor was defective when the vehicle was sold.

Because the Owens presented no evidence from which a jury reasonably could conclude that their loss was the result of the alleged defect that GM failed to disclose, the MMPA claim cannot survive summary judgment.

III.

Accordingly, we affirm the judgment of the district court.

_____